**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| AMERICAN NATIONAL INSURANCE COMPANY, a Texas corporation,<br><br>    Plaintiff,<br><br>v.<br><br>CAROLINE SHERLOCK,<br>A South Carolina individual,<br><br>    Defendant. | Case # 1:23-cv-03713-MGL<br><br>**COMPLAINT** |

Plaintiff American National Insurance Company ("American National") files this Complaint against Defendant Caroline Sherlock ("Defendant"), pursuant to 28 U.S.C. §§ 2201, *et seq.*, seeking a judgment declaring American National life insurance policy no. 15029086 (the "Policy") is unenforceable and void *ab initio* against public policy because: (1) the Policy is wagering contract, obtained in bad faith, in violation of the rule against wagering contracts, and (2) the Policy is void *ab initio* as an illegal contract procured in violation of various State and federal statutes, including the Racketeer-Influenced and Corrupt Organization Act ("RICO"); and holding: (3) Defendant has violated RICO, (4) Defendant has conspired to violate RICO, and (5) Defendant has committed fraud against American National. American National seeks its damages incurred as a result of Defendant's misconduct, exemplary damages, reasonable and necessary attorneys' fees, costs, and pre- and post-judgment interest.

**Parties**

1. American National is a Texas corporation with its principal place of business in Galveston, Texas.

1

2.     Defendant is an individual that resides in North Augusta, South Carolina and is a citizen of the State of South Carolina.

## Jurisdiction and Venue

3.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties to this cause of action and the amount in controversy exceeds $75,000. Jurisdiction is also proper pursuant to 28 U.S.C. § 1331 because American National's RICO claims against the Defendant, brought under 18 U.S.C. § 1962, arise under federal law.

4.     This Court has personal jurisdiction over Defendant, and venue is proper in this District pursuant to 28 U.S.C. § 1397, because Defendant resides in this District and the conduct in question in this dispute occurred in this District.

## Statement of Facts

### I.     The Murphy Village Insurance Conspiracy

5.     Murphy Village is a small community located in North Augusta, South Carolina with approximately 2,000 residents.

6.     The Federal Bureau of Investigation ("FBI") investigated racketeering and various forms of mail fraud, wire fraud, government benefits fraud, life insurance fraud, and other financial crimes among certain persons living in Murphy Village, and persons affiliated with them (the "Investigation").  *See* Ex. 1, Affidavit of Ron Grosse, ¶¶ 3, 13-19.

7.     The Investigation uncovered efforts by certain persons in Murphy Village, persons affiliated with the community, and life insurance agents to defraud life insurance companies (the "Murphy Village Insurance Conspiracy" or "Conspiracy"). *Id.* The Conspiracy spanned a number of years and involved defrauding life insurance companies by knowingly submitting applications

2

and forms containing false information and intentionally omitted material information, in addition to procuring policies with the premeditated intent to sell, barter, and trade those policies to persons lacking an insurable interest, in violation of the rule against wagering contracts. *Id.*

8. The Conspiracy included thousands of life insurance policies fraudulently procured from various insurance companies. *Id.* ¶ 13. At the time of the Investigation, at least $535,000,000 dollars' worth of life insurance policies had been applied for by persons in Murphy Village. *Id.*

9. Under the Conspiracy, life insurance policies were obtained by submitting fraudulent applications that contained material misrepresentations of fact to obtain higher coverage amounts, such as grossly misrepresenting the insured's income, net worth, employment status, health condition, and the amount of existing life insurance coverage on the insured. *Id.* ¶ 15. The misrepresentations were designed to induce insurance companies to issue policies of life insurance, often at higher coverage amounts than the applicant might qualify for, if they qualified at all. *Id.* It was common practice for members of the enterprise to seek out and obtain multiple life insurance policies on persons who had serious health conditions without disclosing the nature and extent of the applicant's health. *Id.*

10. The Investigation found that participants in the Conspiracy were familiar with restrictions prohibiting persons from taking out policies on persons in whom they lack an insurable interest. *Id.* ¶ 17. Such participants employed several different schemes to evade this rule. *Id.* One of the more common schemes involved procuring a policy with the express intent that it would be paid for, controlled by, and later transferred to an unrelated third party with no insurable interest in the insured. *Id.* The characteristics of this scheme were typically as follows:

   a. An application is submitted to the insurance company that misrepresents the net worth, income, employment status, health, and contact information for the insured. In the application, the named beneficiary is either: (1) a person represented as having an insurable interest by virtue of their relationship with the insured, e.g.,

      spouse, parent, or child; or (2) a person who by virtue of their relationship with the insured lacked an insurable interest.

b. From its inception, the policy premiums are paid by a third party, unrelated to the insured and who lacks an insurable interest, but for whom and to whom the insured procured the policy with the intent to transfer.

c. Either: (1) the policy application lists the third party's address and/or phone number as that of the insured; or (2) a request is submitted to the insurance company after the policy is procured that the insured's address and phone number be changed to that of the third party. This ensures the third party controls all correspondence with the insurance company regarding the policy.

d. A change-of-beneficiary form is submitted to the insurance company naming as the beneficiary the unrelated third party who paid the premiums from the policy's inception. To create the illusion of an insurable interest, this form falsely identifies the third party as a relative to the insured, most often a "cousin," "nephew," "niece," or "in law."

e. A change-of-ownership form is submitted to the insurance company transferring ownership of the policy to the unrelated third party who paid premiums from the policy's inception. To create the illusion of an insurable interest, this form also falsely identifies the third party as a relative to the insured, most often a "cousin," "nephew," "niece," or "in law."

f. Often, the forms identified in items (d) and (e) are executed on the same day but submitted later and separately in order not to draw attention to the submissions.

g. In some cases, the premium payor recruits other unrelated persons to help pay policy premiums with the promise that these other payors will receive some of the death benefits under the policy.

h. In some cases, the policy is sold to other unrelated persons who take over premium payments.

*Id.* ¶ 17.

    11.    The Investigation showed participants in the Conspiracy often owned and/or were beneficiaries of several policies. *Id.* ¶ 18.

4

**II.    The Investigation resulted in the conviction of at least 52 co-conspirators under RICO, including life insurance agent Leonard New and Caroline Sherlock.**

12.    The Investigation resulted in criminal charges filed against 52 individuals in Murphy Village and others affiliated with the community, including insurance agent Leonard New ("New") and Defendant Caroline Sherlock.

**A.    Indictment of and Guilty Plea by New and Caroline Sherlock.**

13.    On August 8, 2016, New and twenty-one others were indicted on forty-five criminal counts in *U.S. v. Hannah Carroll, et al.*, No. 1:16-cr-632, filed in this Court ("Indictment"). Count 1 of the Indictment charged New, Caroline Sherlock, and their co-conspirators with Conspiracy to Commit Racketeering in violation of Title 18, United States Code, § 1962(d). The Indictment is attached and incorporated as Exhibit 2.

14.    New, Caroline Sherlock and the other twenty named defendants were charged with being part of a RICO "Enterprise," as defined by 18 U.S.C. § 1961(4): "an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objective of a criminal Enterprise." Exhibit 2, Indictment, ¶ 3. As noted in the Indictment, one of the Enterprise's purposes was to "[e]nrich[] the members and associates of the Enterprise through defrauding insurance companies." *Id.* at ¶ 4C.

15.    Specifically, the Indictment provided that:

> Members and associates of the Enterprise defrauded life insurance companies by submitting false and fraudulent information regarding the insured's health and financial status on insurance applications or allowed others to submit false and fraudulent information regarding the insured's health and financial statues on insurance applications. In some instances, members and associates of the Enterprise obtained life insurance policies on other members and associates of the Enterprise, and they often misrepresented their relationship to the insured, as well as the health of the insured, on the insurance applications. Members and associates of the Enterprise sent or allowed co-conspirators to send the applications for life insurance

5

>     via the U.S. mail and interstate wires for the purpose of executing
>     the scheme to defraud.

*Id.* at ¶ 8d.

16.     On February 28, 2017, Caroline Sherlock pled guilty to Count 1 of the Indictment (the "Caroline Sherlock Plea"). The Caroline Sherlock Plea is attached and incorporated as Exhibit 3.

17.     On March 3, 2017, New pled guilty to Count 1 of the Indictment (the "New Plea"). The New Plea is attached and incorporated as Exhibit 4.

18.     On October 12, 2018, Judgment in Criminal Case, Case Number 1:16-cr-632-JMC(4) was entered against Caroline Sherlock (the "Caroline Sherlock Judgment"). The Caroline Sherlock Judgment is attached and incorporated as Exhibit 5. The Caroline Sherlock Judgment sentenced Sherlock to three (3) years of supervised release and ordered that she pay restitution and forfeit all proceeds of the Conspiracy.

19.     On January 14, 2019, Judgment in a Criminal Case, Case Number 1:16-cr-632-JMC(21) was entered against New (the "New Judgment"). The New Judgment is attached and incorporated as Exhibit 6. The New Judgment sentenced New to 24 months in prison, with two years of supervised release, ordered that he pay restitution and forfeit all proceeds of the Conspiracy.

20.     As part of his Plea Agreement, New agreed to cooperate with the FBI in its Investigation into the Conspiracy. *See* Exhibit 7, New Affidavit ¶ 5. New worked directly with FBI Special Agent Ron Grosse and provided him and other federal agents with information that assisted the government in bringing claims against other members of the Murphy Village Insurance Conspiracy. *Id.*

21.     Much of the information New provided to the FBI was included in Section II(A) of the United States' Sentencing Memorandum submitted in many, if not all, of the Murphy Village RICO cases and the subsequent related criminal conspiracy cases. *See* Exhibit 8, Sentencing Memorandum, at Section II(A).

22.     As noted in the United States' Sentencing Memorandum, Caroline Sherlock applied for life insurance policies after being diagnosed with cancer, yet never disclosed the diagnosis. Ex. 8, Sentencing Memorandum, at 7.

23.     New's assistance resulted in subsequent criminal conspiracy charges, brought by way of Information, against twenty-five other persons in Murphy Village also engaged in the Conspiracy, filed in this Court on August 22, 2017, in *U.S. v. John U. Carroll, et al.*, CR No. 1:17-cr-777.

24.     New has since admitted:

   a. "Essentially every policy I helped procure for persons in the Irish Traveler community . . . was part of the RICO life insurance fraud scheme[.]" *See* Ex. 7, New Affidavit ¶ 13.

   b. "To obtain these policies, applicants, others in the community, and insurance agents, including myself, submitted fraudulent applications and forms and premium payments through the U.S. Mail and by wire.  These applications and forms often misrepresented the income of the insured, the net worth of the insured, the employment status of the insured, the basis for the policy (e.g., whether there was a true insurable interest), the insured's address, the absence of other policies, mortgages held by the insured, and/or the health of the insured, in and effort to obtain a policy that otherwise would not have been issued." *Id.* ¶ 8.

   c. "Almost every policy application I was involved in submitting for persons in the Irish Traveler community contained misrepresentations as to income, net worth, and employment status of the applicant." *Id.* ¶ 9.

   d. "For male members of the community, this often involved inserting a number I knew would allow the policy to issue. **For female applicants, because I knew that women in the Irish Traveler community do not work and have no income or net worth to speak of, essentially every application for insurance I wrote or was involved in writing for a female member of the Irish Traveler community**

7

**contained gross misrepresentations about the applicant's income, net worth, and employment status**." *Id.* (emphasis added).

e. "[I]n many cases, policies were procured by the insured with no intent to keep the policy, and with the express intent of transferring the policy to an unrelated person with no insurable interest after the policy issued. The applications and policy forms would misrepresent the familial relationship of the beneficiary, or a person to whom the policy was eventually transferred, in an effort to create the appearance of an insurable interest where one did not exist. This was done to evade the rule against wagering policies." *Id.* ¶ 10.

f. "[I]n many cases, policies were procured by the insured but were controlled by and paid for by a third party with no insurable interest in the insured, but who expected to receive the benefits under the policy when the insured died. Applications and policy forms for these policies misrepresented the insured's mailing address and phone number. The address and phone number listed would be that of the person who paid the policy premiums and controlled the policy, including correspondence from the 'insured' with American National. This was also done in an effort to evade the rule against wagering policies." *Id.* ¶ 11.

g. "[I]n many cases, persons who controlled the policies would recruit other people in the community to pay policy premiums in exchange for a stake in the benefits under the policy when the insured died. Generally, these payors lacked an insurable interest in the insured. This was also done in an effort to evade the rule against wagering policies. *Id.* ¶ 12.

### B. The Information and Guilty Plea by Ann Carroll.

25. Ann Carroll was one of several defendant co-conspirators charged under the Information filed in *U.S. v. John U. Carroll, et al.*, No. 1:17-cr-777. *See* Ex. 9, Information.

26. Persons charged under the Information were accused of, *inter alia*:

a. using interstate wires and the mail to defraud life insurance companies by submitting false and fraudulent information regarding the insured's health and financial status on insurance applications, or permitting others to submit false and fraudulent information regarding the insured's health and financial status on insurance applications, *see* Exhibit 9, ¶ 2(e); and

b. using illegally obtained funds to pay for and purchase life insurance policies on members of the conspiracy that were fraudulently obtained. *Id.* ¶ 2(f).

27. All of the twenty-five defendants charged in the Information pled guilty.

8

28.     On October 24, 2017, Ann Carroll pled guilty to Count 1 of the Information (the "Ann Carroll Plea").  The Ann Carroll Plea is attached and incorporated as Exhibit 10.

29.     On May 30, 2019, Ann Carroll submitted a Sentencing Memorandum in which she identified at least five separate life insurance policies she had procured or attempted to procure through as part of the Conspiracy. The Sentencing Memorandum is attached and incorporated as Exhibit 11.

30.     On August 21, 2019, Judgment in a Criminal Case, Case Number 1:17-cr-777-JMC(23) was entered against Ann Carroll (the "Ann Carroll Judgment"). The Ann Carroll Judgment is attached and incorporated as Exhibit 12. The Ann Carroll Judgment sentenced Ann Carroll to 4 months in prison, with two years of supervised release, ordered that she pay restitution and forfeit all proceeds of the Conspiracy.

### III.     Policy No. 15029086.

31.     On February 24, 2014, Defendant Caroline Sherlock and Leonard New jointly completed and submitted to American National an Application for life insurance on the life of Caroline Sherlock (the "Application").  Ex. 13, Application.

32.     The Application contains material misrepresentations as to: (1) the insured's annual income; (2) the insured's net worth; (3) the insured's employment status; (4) false identification of the insured's employer; (5) whether there were other life insurance policies issued against the insured; and (6) whether the insured suffered from any adverse health issues. Ex. 13, Application. These misrepresentations and subsequent misrepresentations Defendants made to American National are consistent with those that were part of the Murphy Village Conspiracy.

33. The Application named Pete J. Sherlock, Caroline Sherlock's purported "husband," as the original beneficiary. *Id*. Upon information and belief, Pete Sherlock may not be Caroline Sherlock's husband.

34. The Application named Ann Carroll as Caroline Sherlock's "mother." *Id*. Upon information and belief, this is the same Ann Carroll who pled guilty to the forementioned Information.

35. The Application named Johnny Carroll as Caroline Sherlock's "father." *Id.* Upon information and belief, this is the same Johnny Carroll who pled guilty to the aforementioned Information.

36. On March 6, 2014, based on representations made in the Application, American National issued policy no. 15029086 (the "Policy") on the life of Caroline Sherlock, in an amount of $250,000.

37. Upon information and belief, convicted co-conspirator Ann Carroll and one or more RICO co-conspirators made payments on the Policy, despite being neither the owner nor beneficiary of the Policy. *See* Ex. 14, Payment Records.

38. Although the Application listed Defendant's address as 61 Murphy Street, North Augusta, South Carolina, *see* Ex. 13, Application, all mail and payments related to the Policy originated from PO Box 7705, North Augusta, South Carolina. *See* Ex. 14, Payment Records. Upon information and belief, this PO Box is assigned to and used by Ann Carroll.

39. Although the Application listed the Defendant's phone number as 803-439-8843, *see* Ex. 13, Application, this is in fact the telephone number for Ann Carroll. *See* Ex. 14, Payment Records.

40. Upon information and belief, Ann Carroll and one or more RICO co-conspirators maintained complete control of the Policy from its inception with the expectation that it would pay out to their financial benefit, despite being neither beneficiaries, owners, nor named interested parties in the Policy. *See id.*

41. Based on the foregoing, the Policy is a wagering contract procured as part of the Murphy Village Insurance Conspiracy.

42. Based on the foregoing, the Policy was procured and maintained through fraud as part of the RICO Conspiracy.

43. American National hereby constructively tenders the amount of premium paid on the Policy, with interest, to the Court. American National asks that, if required, the Court grant it leave to deposit these funds into the Court's registry pending resolution of this case.

**For a First Cause of Action**
**(Declaratory Judgment)**
**(Void *Ab Initio*, Wagering Contract)**

44. Paragraphs 1 through 43 of this Complaint are realleged and incorporated as if set forth fully herein.

45. The Federal Declaratory Judgment Act states:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).

46. Under South Carolina law, one cannot procure a life insurance policy on the life of a person in whom he or she lacks an insurable interest. *Foster v. United Ins. Co.,* 250 S.C. 423, 158 S.E.2d 201, 202–03 (1967); *Elmore v. Life Ins. Co. of Va.*, 187 S.C. 504, 198 S.E. 5, 6 (1938);

*Henderson v. Life Ins. Co. of Va.*, 176 S.C. 100, 179 S.E. 680, 685 (1935). Such a policy is a "wagering contract," and is void *ab initio* as against public policy. *Id.* "[A]lthough one may procure insurance on his own life and name whomsoever he chooses *as beneficiary, such a transaction must be bona fide*, and not a mere scheme to circumvent the law against wagering contracts." *Henderson*, 179 S.E. at 691 (emphasis in original). Where a policy is procured in such a manner with the intent to evade the rule against wagering contracts, it is void *ab initio*. *See id.*

47. American National seeks declaratory judgment that the Policy is unenforceable and void *ab initio* against public policy, insofar as the Policy is a wagering contract procured in bad faith in an attempt to evade the rule against wagering contracts.

48. Defendant procured the Policy with the intent to allow a third party to surreptitiously pay for, control, and ultimately benefit from the Policy, despite the third party lacking an insurable interest in the Defendant's life.

49. Defendant submitted a request to American National that Ann Carroll's address be listed as that of the insured so that Ann Carroll would maintain complete and exclusive control over all aspects of the Policy. Ann Carroll at all relevant times did maintain complete and exclusive control over all aspects of the Policy, despite being neither the owner nor beneficiary of the Policy.

50. As part of the agreement between Defendant and Ann Carroll, Ann Carroll paid all premiums on the Policy from its inception, despite being neither the owner nor beneficiary of the Policy.

51. Pursuant to the Uniform Declaratory Judgment Act, codified at 28 U.S.C. §§ 2201 – 2202, and Federal Rule of Civil Procedure 57, American National is entitled to a declaration from this Court that: (i) the Policy is void *ab initio* because it violates public policy, and therefore is of no force and effect and imposes no obligations upon American National, and that (ii)

American National may retain any and all premiums paid for the Policy due to Defendant's conduct. American National seeks all other available relief, including its attorneys' fees.

### For a Second Cause of Action
### (Declaratory Judgment)
### (Void *Ab Initio,* Illegal Contract Procured in Violation of RICO)

52. Paragraphs 1 through 51 of this Complaint are realleged and incorporated as if set forth fully herein.

53. "The general rule, well established in South Carolina, is that courts will not enforce a contract when the subject matter of the contract or an act required for performance violates public policy as expressed in constitutional provisions, statutory law, or judicial decisions." *White v. J.M. Brown Amusement Co.*, 360 S.C. 366, 371, 601 S.E.2d 342, 345 (2004). "[A] contract in violation of a criminal statute is invalid [and] . . . . an agreement made in violation of a penal statute . . . is void and unenforceable whether executory or executed." 17A Am. Jur. 2d Contracts § 226 (2022).

54. The Policy is a wagering contract procured in violation of certain state and federal criminal statutes, including RICO.

55. Pursuant to the Uniform Declaratory Judgment Act, codified at 28 U.S.C. §§ 2201 – 2202, and Federal Rule of Civil Procedure 57, American National is entitled to a declaration from this Court that: (i) the Policy is void *ab initio* because it violates public policy, and therefore is of no force and effect and imposes no obligations upon American National, and (ii) American National may retain any and all premiums paid for the Policy due to Defendant's conduct. American National seeks all other available relief, including its attorneys' fees.

### For a Third Cause of Action
### (Violation of RICO Act, 18 U.S.C. § 1962(c))

56. Paragraphs 1 through 55 of this Complaint are realleged and incorporated as if set forth fully herein.

57. The Fourth Circuit has set out the elements of a civil RICO violation:

> …a civil RICO claim has four essential elements: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity.

*Whitney, Bradley & Brown, Inc. v. Kammermann*, 436 Fed. Appx. 257, 258-59 (4th Cir. 2011) (internal citations omitted).

58. Caroline Sherlock has admitted to this Court through guilty plea that she was a RICO conspirator.

59. Leonard New and FBI Special Agent Ron Grosse have each provided testimony that supports the conclusion that the Policy was procured and maintained as part of the Murphy Village Insurance Conspiracy giving rise to the Criminal RICO Case, to which New, Caroline Sherlock, and numerous others pled guilty.

60. Defendant, as an owner and payor of the Policy, has violated civil RICO provisions under 18 U.S.C. § 1962(c), by participating, directly or indirectly, in the conduct of the affairs of an enterprise under 18 U.S.C. § 1961(4) through a pattern of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

61. The predicate acts of racketeering activity in which Defendant engaged included violations of Title 18, United States Code, Sections 1341 (Mail Fraud), 1343 (Wire Fraud), 1956 (Money Laundering), and 1957 (Monetary Transactions).

62. American National is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

63. American National was injured by Defendant's conduct. Defendant's actions have directly, illegally, and proximately caused injury to American National.

64. American National seeks an award of damages in compensation for administrative costs and other pecuniary injuries sustained by Defendant's misconduct. American National also

seeks an award of three times the damages sustained and recovery of reasonable attorneys' fees and costs, as well as any other relief to which American National is entitled.

### For a Fourth Cause of Action
### (Conspiracy to Violate RICO Act, 18 U.S.C. § 1962(d))

65. Paragraphs 1 through 64 of this Complaint are realleged and incorporated as if set forth fully herein.

66. For the reasons discussed above, Defendant has conspired to commit a violation of civil RICO provisions under 18 U.S.C. § 1962(d) by participating, directly or indirectly, in the conduct of the affairs of an enterprise under 18 U.S.C. § 1961(4) which conspired to commit and did commit "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

67. The predicate acts of racketeering activity in which Defendant engaged included violations of Title 18, United States Code, Sections 1341 (Mail Fraud), 1343 (Wire Fraud), 1956 (Money Laundering), and 1957 (Monetary Transactions).

68. American National seeks an award of damages in compensation for administrative costs and other pecuniary injuries sustained by Defendant's misconduct. American National also seeks an award of three times the damages sustained and recovery of reasonable attorneys' fees and costs, as well as any other relief to which American National is entitled.

### For a Fifth Cause of Action
### (Fraud)

69. Paragraphs 1 through 68 of this Complaint are realleged and incorporated as if set forth fully herein.

70. Defendant knew the application submitted for the Policy contained material misrepresentations related to the insured's annual income, net worth, and employment status at the time the Policy was applied for and at all times relevant while the Policy was in effect. New and

Defendant concocted a scheme to defraud American National by applying for life insurance through fraudulent application policies, and to transfer ownership to via submission of transfer forms that fraudulently misrepresented an insurable interest where none existed.

71. Defendant applied for the Policy, knowingly and intentionally making false statements and misrepresentations to American National.

72. American National issued the Policy based on the representations made or caused to be made by Defendant. But for the misrepresentations and falsities made or caused to be made by Defendant, American National would not have issued the Policy.

73. Defendant knowingly and intentionally made or caused to be made the misrepresentations and falsities to American National with the intent American National would rely on the falsities and misrepresentations and issue the Policy. Defendant intended to unjustly profit from the proceeds of the Policy, obtained under fraudulent pretenses from American National.

74. American National had no knowledge of the falsities and misrepresentations made or caused to be made by Defendant, nor did it have any reason to.

75. American National acted in reliance on the falsities and misrepresentations made or caused to be made by Defendant in the applications and other documents submitted to American National.

76. Defendant was under a duty to make truthful and complete representations to American National, which he knowingly and intentionally failed to do.

77. As a consequent and proximate result of Defendant's misrepresentations and falsities, American National suffered injury by relying on such misrepresentations and falsities in issuing and administering the Policy, including costs necessary to bring this action.

## PRAYER

WHEREFORE, American National respectfully requests that the Court permit American National's constructive tender of premium funds paid on the Policy, with interest, or, in the alternative, permit American National to deposit such into the registry of the Court. Upon final adjudication, American National asks that the Court find in its favor on all claims and enter a judgment:

- a. declaring that the Policy is void *ab initio* as obtained in violation of the rules preventing wagering contracts;
- b. declaring that the Policy is void *ab initio* as the product of RICO violations;
- c. holding that Defendant has violated RICO;
- d. holding that Defendant has conspired to violate RICO;
- e. holding that Defendant has committed fraud against American National; and
- f. awarding American National:
    - i. its actual damages;
    - ii. three times the amount of actual damages;
    - iii. its reasonable attorneys' fees and costs;
    - iv. pre- and post-judgment interest; and
    - v. all other relief to which American National is entitled, whether at equity or law.

(Signature block on following page)

Dated: July 31, 2023

WILLIAMS MULLEN

s/ Derek D. Tarver
Derek D. Tarver
Federal Bar No.: 12729
dtarver@williamsmullen.com
1230 Main Street, Ste. 330
Columbia, SC 29201
Telephone: 803-567-4610
Facsimile: 803-567-4601

*Counsel for American National Insurance Company*