# Exhibit 1

### Affidavit of Ronald Grosse

Being first duly sworn, on this day personally appeared Ronald Grosse, a person whose identity is known to me, who deposes and states the following:

1. My name is Ronald Grosse. I was a Special Agent with the Federal Bureau of Investigation ("FBI") for twenty-eight years. I am currently retired from that position. My responsibilities with the FBI included investigating violations of federal criminal statutes, specifically white-collar crimes. I presently work as an investigator for the Georgia Innocence Project.

2. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

### Murphy Village RICO Investigation & Subsequent Criminal Prosecution

3. In my role as an FBI Special Agent, I was the case agent on a 3-year investigation of a criminal organization that operated in Murphy Village, South Carolina. This organization engaged in racketeering and various forms of mail fraud, wire fraud, government benefits fraud, life insurance fraud, and other financial crimes (the "Investigation"). My work in the Investigation included reviewing thousands of life insurance policies, interviewed certain insured, beneficiaries, and owners of the policies, reviewed financial records for these persons, among other tasks.

4. The Investigation resulted in the indictment of 22 persons in *U.S. v. Hannah Carroll, et al.*, CR. No.: 1:16-cr-632-JMC. Each of the defendants in that case were charged with being members of an enterprise engaged in a conspiracy to violate the Racketeer Influenced and Corrupt Organizations ("RICO") Act, in violation of Title 18 United States Code, Section 1962(d). A true and correct copy of the indictment in *U.S. v. Hannah Carroll, et al.*, CR. No: 1:16-cr-632-JMC is attached as Exhibit 1 to this affidavit ("Indictment"). The members of the enterprise were also charged with individual violations of criminal statutes. *See id.*

5. The Investigation also resulted formal charges against a separate group of 25 persons by way of an Information in *U.S. v. John U. Carroll, et al.,* CR. No. 1:17-cr-777. Each of the defendants in that case were charged with being part of a conspiracy to commit mail fraud, wire fraud, money laundering, transportation of stolen goods, and structuring, in addition to using interstate wires and the mail to defraud life insurance companies by submitting false and fraudulent information regarding the insured's health and financial status on insurance applications or allowed others to submit false and fraudulent information regarding the insured's health and financial status on insurance applications. A true and correct copy of the Information in *U.S. v. John U. Carroll, et al.*, CR. No. 1:17-cr-777, is attached as Exhibit 2 to this Affidavit.

6. The Investigation also resulted in formal charges against insurance agent Douglas Wade Williamson by way of Indictment and Information in *U.S. v. Douglas Wade Williamson*, CR. No. 1:17-cr-987, in which Mr. Williamson was charged as being part of a conspiracy to commit mail fraud and wire fraud to defraud life insurance companies by submitting false and fraudulent information regarding the insured's health, financial status, and familial relations on insurance applications, and allowing others to submit false and fraudulent information regarding the insured's health, financial status, and familiar relations on insurance applications. A true and correct copy of the Indictment and Information in *U.S. v. Douglas Wade Williamson*, CR No. 1:17-cr-987, is attached as Exhibit 3 to this Affidavit.

7. The Indictments and Informations in the abovenamed criminal cases charged that the defendants and their associates collectively engaged in, among other things, mail fraud and wire fraud in furtherance of a scheme to defraud life insurance companies. As explained in the Indictments and Informations, the defendants and their associates would perpetuate this fraud by submitting false and fraudulent information regarding the insured's health, financial status and/or

work history on insurance applications, or by allowing others to submit insurance applications containing such false and fraudulent information regarding the applicant's health and/or financial status. The defendants and their associates intended for this false and/or fraudulent information to induce insurance companies into issuing policies on the lives of the applicants. In some instances, the defendants and their co-conspirators obtained life insurance policies on other defendants or co-conspirators, and they often misrepresented their relationship to the insured, as well as the health and finances (including work history) of the insured, on the insurance applications. The defendants and their associates then sent or allowed to be submitted the applications for life insurance and other related forms via the U.S. mail and interstate wires for the purpose of executing the scheme to defraud. *Id.* The life insurance fraud scheme described above is referred to hereinafter as the "Murphy Village Insurance Conspiracy" or "Conspiracy."

8. Insurance agents Leonard New and Douglas Wade Williamson were indicted for being a member of the enterprise.

9. Leonard New's and Douglas Wade Williamson's participation in the Conspiracy centered on their roles as life insurance agents. Those defendants' roles as life insurance agents provided participants in the scheme a means to submit fraudulent applications and other documents in an effort to obtain life insurance policies that otherwise would not have been issued. New has testified under oath that the vast majority of policies he issued in Murphy Village were fraudulent in their inception and were part of the RICO conspiracy.

10. On February 16, 2017, Leonard New entered a plea agreement whereby he pled guilty to Count 1 of the Indictment for his role as a member of the enterprise. New Plea, *U.S. v. Hannah Carroll, et al.*, CR. No: 1:16-cr-00632-JMC.

11. On April 30, 2018, Douglas Wade Williamson pled guilty to Count 1 of the Information filed in his case, which charged conspiracy in violation of 18 U.S.C. 371. *See* Williamson Plea, *U.S. v. Williamson*, 1:17-cr-00987-JFA.

12. Leonard New cooperated with the United States government and I worked directly with him. New provided information to me related to the Murphy Village Fraud Conspiracy to assist in the prosecution of the government's claims against members of the enterprise and other participants in the scheme to defraud life insurance companies.

## The Murphy Village Insurance Conspiracy

13. Based on my participation in the Investigation, I have personal knowledge of the identity of many of the participants and the patterns of fraud employed by participants in the Murphy Village Insurance Conspiracy. The Conspiracy involves thousands of life insurance policies fraudulently procured from various different insurance companies. At the time of the Investigation, there were at least $535,000,000.00 (five-hundred-and-thirty-five-million dollars) worth of life insurance policies applied for by persons in Murphy Village.

14. The Conspiracy spanned a number of years and involved a concerted effort between persons in the Irish Traveler community and certain insurance agents, including Leonard New and Douglas Wade Williamson, to repeatedly and consistently defraud life insurance companies by knowingly submitting applications and forms that contained false information and intentionally omitted material information.

15. Participants involved in the Conspiracy would obtain life insurance policies by submitting applications that typically contained material misrepresentations as to the following facts:

    a. The income of the insured. The insured's income was often grossly misrepresented in an effort to obtain higher coverage.

  b. The net worth of the insured. The insured's net worth was often grossly misrepresented in an effort to obtain higher coverage.

  c. Employment status of the insured. The insured's employment status was often misrepresented in an effort to obtain higher coverage.

  d. Insurable interest in the insured. The policies were often purchased by an insured, or by a person with an insurable interest in the insured, and ownership was later transferred to a person who lacked an insurable interest but who misrepresented that he or she was a relative to the insured, in an effort to establish an insurable interest. Members of the enterprise were aware that life insurance companies will not sell a life insurance policy to a person unless that person has an insurable interest in the life of the insured.

  e. Address of the insured. Often, a member of the enterprise would list his or her address as the address of the insured in order to control the information being received from and submitted to the insurance companies.

  f. Lack of other policies. The number of other policies on the insured were often misrepresented in an effort to obtain greater coverage.

  g. Health of the insured. The insured's health conditions were often misrepresented in order to obtain coverage. It was common practice for members of the enterprise to seek out and obtain multiple life insurance policies on persons who had health conditions that made their end of life more likely.

16. The Conspiracy continued after life insurance policies issued. A common pattern employed by participants involved knowingly transferring ownership and renaming beneficiaries of the policies to persons lacking an insurable interest, surreptitious control of policies between unrelated persons lacking an insurable interest, trading and selling policies, payments of premiums by a person or groups of persons lacking an insurable interest in exchange for an interest in the death benefits, and continually submitting materially false information in renewal applications in furtherance of these frauds.

17. The Investigation determined that participants in the Conspiracy were familiar with restrictions prohibiting persons from taking out policies on persons in whom they lack an insurable interest. The Investigation found that participants employed several different schemes to evade

this rule. One of the more common schemes involved a participant procuring a policy on his or her own life, but with the express intent that the policy would be paid for, controlled, and later transferred to an unrelated third party with no insurable interest in the insured. The characteristics of this scheme are typically as follows:

    a. An application is submitted to the insurance company that misrepresents the net worth, income, employment status, health, and contact information for the insured. In the application, the named beneficiary is either: (1) a person represented as having an insurable interest by virtue of their relationship with the insured, e.g., spouse, parent, or child; or (2) a person who by virtue of their relationship with the insured lacked an insurable interest.

    b. From its inception, the policy premiums are paid for by a third party, unrelated to the insured and who lacks an insurable interest, but for whom and to whom the insured procured the policy with the intent to transfer.

    c. Either: (1) the policy application lists the third party's address and/or phone number as that of the insured, or (2) a request is submitted to the insurance company shortly after the policy is procured that the insured's address and phone number be changed to that of the third party. This is to ensure that the third party controls all correspondence with the insurance company regarding the policy.

    d. Within months after the policy issues, a change-of-beneficiary form is submitted to the insurance company naming as the beneficiary the unrelated third party who paid the premiums from the policy's inception. To create the illusion of an insurable interest, the this form falsely identifies the third party as a relative to the insured, most often a "cousin," "nephew," "niece," or "in law."

e. Also within months after the policy issues, a change-of-ownership form is submitted to the insurance company transferring ownership of the policy to the unrelated third party who paid premiums from the policy's inception. To create the illusion of an insurable interest, the this form also falsely identifies the third party as a relative to the insured, most often a "cousin," "nephew," "niece," or "in law."

f. Often, the forms identified in items (d) and (e) are executed on the same day but submitted later and separately in order not to draw attention to the submissions.

g. In some cases, the premium payor recruits other unrelated persons to help pay policy premiums with the promise that these other payors will receive some of the death benefits under the policy.

h. In some cases, the policy is sold to other unrelated persons who take over premium payments.

18. The Investigation showed participants in the Conspiracy often owned and/or were beneficiaries of several policies.

19. Life insurance policies procured as part of the Conspiracy were traded, bought, sold, and given as dowries between members of the Irish Traveler community.

_____
Ronald Grosse

Sworn to and subscribed to me before this
The 27 of July, 2023

_____
Notary Public Signature

Sara H Tyer
Print Name

My Commission Expires: 7.27.2030

7